**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 16-cv-002844-STV

ADRIENNE E. SOMMERS,

Plaintiff,

v.

NANCY A. BERRYHILL,[1] Acting Commissioner of Social Security,

Defendant.

_____

**ORDER**
_____

Magistrate Judge Scott T. Varholak

This matter is before the Court on Plaintiff Adrienne E. Sommers' Complaint seeking review of the Commissioner of Social Security's decision denying Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 401 *et seq.*, and 1381-83c, respectively. [#1] The parties have both consented to proceed before this Court for all proceedings, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c) and D.C.COLO.LCivR 72.2. [#11] The Court has jurisdiction to review the Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g) and

---

[1] Carolyn Colvin is the named Defendant in the Complaint as she was the Commissioner of Social Security at the time the Complaint was filed. [#1] Nancy A. Berryhill currently serves as the Acting Commissioner of Social Security. [#18 at 1 n.1] Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill, as Commissioner Colvin's successor, "is automatically substituted as a party." *See also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.")

1383(c)(3).  This Court has carefully considered the Complaint [#1], the Social Security Administrative Record [#9], the parties' briefing [##17, 18, 19], and the applicable case law, and has determined that oral argument would not materially assist in the disposition of this appeal.  For the following reasons, the Court **REVERSES** the Commissioner's decision and **REMANDS** for further proceedings.

## I.     LEGAL STANDARD

### A.     Five-Step Process for Determining Disability

The Social Security Act defines disability as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[2]  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  "This twelve-month duration requirement applies to the claimant's inability to engage in any substantial gainful activity, and not just his underlying impairment."  *Lax*, 489 F.3d at 1084.  "In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility . . ., the Commissioner [ ] shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

---

[2] "Substantial gainful activity" is defined in the regulations as "work that (a) [i]nvolves doing significant and productive physical or mental duties; and (b) [i]s done (or intended) for pay or profit." 20 C.F.R. §§ 404.1510, 416.910; *see also* 20 C.F.R. §§ 404.1572, 416.972.

"The Commissioner is required to follow a five-step sequential evaluation process to determine whether a claimant is disabled."  *Hackett v. Barnhart*, 395 F.3d 1168, 1171 (10th Cir. 2005).  The five-step inquiry is as follows:

1. The Commissioner first determines whether the claimant's work activity, if any, constitutes substantial gainful activity;

2. If not, the Commissioner then considers the medical severity of the claimant's mental and physical impairments to determine whether any impairment or combination of impairments is "severe;"[3]

3. If so, the Commissioner then must consider whether any of the severe impairment(s) meet or exceed a listed impairment in the appendix of the regulations;

4. If not, the Commissioner next must determine whether the claimant's residual functional capacity ("RFC")—*i.e.*, the functional capacity the claimant retains despite his impairments—is sufficient to allow the claimant to perform his past relevant work, if any;

5. If not, the Commissioner finally must determine whether the claimant's RFC, age, education and work experience are sufficient to permit the claimant to perform other work in the national economy.

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005); *Bailey v. Berryhill*, 250 F. Supp. 3d 782, 784 (D. Colo. 2017). The claimant bears the burden of establishing a *prima facie* case of disability at steps one through four, after which the burden shifts to the Commissioner at step five to show that claimant retains the ability to perform work in the national economy.  *Wells v. Colvin*, 727 F.3d 1061, 1064 n.1 (10th Cir. 2013); *Lax*, 489 F.3d at 1084.  "A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis."  *Ryan v. Colvin*, 214 F. Supp. 3d 1015, 1018 (D. Colo.

---

[3] The regulations define severe impairment as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c), 416.920(c).

2016) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991)).

**B.      Standard of Review**

In reviewing the Commissioner's decision, the Court's review is limited to a determination of "whether the Commissioner applied the correct legal standards and whether her factual findings are supported by substantial evidence." *Vallejo v. Berryhill*, 849 F.3d 951, 954 (10th Cir. 2017) (citing *Nguyen v. Shalala*, 43 F.3d 1400, 1402 (10th Cir. 1994)). "With regard to the law, reversal may be appropriate when [the Commissioner] either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards." *Bailey*, 250 F. Supp. 3d at 784 (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir.1996)).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax*, 489 F.3d at 1084). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Grogan*, 399 F.3d at 1261-62 (quoting *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992)). The Court must "meticulously examine the record as a whole, including anything that may undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met.'" *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007) (quotation omitted). The Court, however, "will not reweigh the evidence or substitute [its] judgment for the Commissioner's." *Hackett*, 395 F.3d at 1172.

## II.    BACKGROUND

Plaintiff was born in 1979.  [AR 140][4]  She completed four or more years of college, a Department of Veterans Affairs ("VA") vocational rehabilitation program, and earned her master's degree in both business and diplomacy and international commerce.  [AR 188, 475]  Plaintiff is able to communicate in English.  [AR 186]  On October 22, 2013, Plaintiff filed a Title II application for DIB and a Title XVI application for SSI.  [AR 140, 165]  In both applications, Plaintiff claimed a disability onset date of May 5, 2013,[5] and thus was 33 years old at the time of the alleged onset.  [AR 140]  Plaintiff claims disability based upon predominantly mental impairments, including, but not limited to, major depressive disorder, anxiety disorder, borderline personality disorder, dysthymic disorder, and post-traumatic stress disorder ("PTSD").  [AR 187]

Plaintiff is a veteran of the United States Army, where she served as an officer from approximately 2001 to 2005.  [AR 357]  She also worked in a variety of other positions prior to the alleged disability onset date, including as an account representative for a human resources ("HR") recruiting firm and economic analyst for a government contracting business.  [AR 189]  Plaintiff worked as an HR specialist for the Federal Government at the Bureau of Reclamation from October 2012 until October 2013.  [*Id.*; *see also* AR 237]  Most recently, Plaintiff worked intermittent part-time positions at an art supply store, from approximately February 2014 through June of

---

[4]  All references to "AR" refer to the sequentially numbered Social Security Administrative Record filed in this case.  [#9]

[5]  As noted in the ALJ opinion, the claimant amended the onset date to October 21, 2013, but at the hearing requested that the ALJ reinstate the initial onset date of May 5, 2013.  [AR 15; *see also* AR 42-43]  Accordingly, the ALJ considered whether the claimant was under a period of disability beginning May 5, 2013.  [*Id.*]

2014, and at a wine shop from July 2014 through approximately October 2014. [AR 18, 697]

### A. Medical Background

Plaintiff has a history of borderline personality disorder and major depressive disorder. [*See, e.g.*, AR 520, 601] The mental health treatment records before this Court date back to October 2012.[6] [AR 605] Licensed Clinical Social Worker Rachel Bensinger saw Plaintiff for psychotherapy sessions throughout the latter part of 2012. [AR 597, 603, 605-07] Bensinger noted Plaintiff's paranoia with respect to her beliefs that individuals at work were sending embarrassing emails about her, but also indicated that Plaintiff was complying with her medications and exercising regularly. [AR 597, 606] Plaintiff's anxiety increased when she began a new job at the end of 2012. [AR 597]

In May 2013, Plaintiff was voluntarily hospitalized for exacerbated major depressive disorder for approximately five days. [AR 519] Upon admission, she reported that she had experienced insomnia for several days preceding the hospitalization, had decreased appetite and poor energy, and was unable to work or take care of daily activities. [AR 520] Plaintiff was unable to identify a triggering event for the depressive episode, though providers noted Plaintiff's "vague paranoia at work, . . . ongoing issues with trust, low energy," and low self-esteem. [AR 536-37] During Plaintiff's hospital stay, she was actively involved in group therapy [AR 532] and

---

[6] Although Plaintiff has also sought treatment for physical ailments, including obstructive sleep apnea, fatigue, obesity [*see, e.g.*, AR 19, 22, 584, 585, 698-706], a shoulder injury following a motor vehicle accident [*see, e.g.*, AR 776-78], and has struggled with an eating disorder [*see, e.g.*, AR 591], Plaintiff does not challenge any of the ALJ's findings with respect to her physical impairments and thus the Court does not address them here.

providers reported that she "recompensated quickly" with the support and structure of inpatient treatment, that she was forward thinking, and looking forward to returning to work [AR 511-12]. Plaintiff developed a Mental Health Safety Plan upon her release, including identifying warning signs of a mental health crisis, internal coping strategies, and people and professionals to turn to for help and support. [AR 514-15]

Following the hospitalization, Plaintiff continued treatment with Bensinger and continued to express paranoia with respect to co-workers and her job. [AR 498-99] She also described her financial distress, including her difficulty keeping up with student loan payments, and the often stressful nature of her relationship with her mother. [AR 498-99, 506] On July 4, 2013, Plaintiff presented to the emergency room with suicidal ideation ("SI"), with a plan to cut her wrists and overdose on her medications. [AR 281] Plaintiff cited purported rumors spreading about her at work, and interpersonal conflicts with coworkers and family members, including her stressful relationship with her mother. [AR 281-82, 474] Plaintiff identified financial difficulties as another major source of stress, including the financial burdens of her mental health treatment. [AR 281, 467, 490] Plaintiff was discharged a few days later, per her request. [AR 445-46] Providers stated that Plaintiff was "in excellent behavioral control," was engaged in safety planning, no longer had SI, and she felt that the crisis had passed. [AR 446, 452-54]

Plaintiff was hospitalized again on July 26, 2013 and was transferred to Centennial Peaks Hospital, a mental health facility. [AR 415, 421-23, 426-27] She was initially admitted involuntarily but ultimately spent several days at the facility on a voluntary basis. [AR 415, 419, 424] Following this hospitalization, Plaintiff reviewed her Mental Health Safety Plan with providers [AR 411], and was seen by Bensinger for

continued therapy [AR 407]. Bensinger reported that Plaintiff's mood was much improved, that she had better control over her emotions, her thoughts were more logical, and that she was actively engaged in coping skills. [AR 407] Bensinger also noted Plaintiff's positive involvement in her own treatment and her ability to seek crisis support. [AR 402-3] Plaintiff participated in group therapy where she consistently was an active participant, contributing to discussions and providing support to other group members. [*See, e.g.*, AR 368, 376, 393, 400, 404] Plaintiff returned to work after three weeks of family medical leave time. [AR 402]

By October 2013, providers recommended that the suicide risk flag be removed from Plaintiff's veteran medical file, because she was no longer in crisis, the acute risk for suicide had been resolved, she was engaged in both individual and group therapy, and had resigned from her job, which had been a primary stressor. [AR 380] Plaintiff's active involvement in her treatment and her strong alliance with her mental health provider were also noted, and the suicide risk flag was removed. [*Id.*] During psychotherapy appointments in November and December 2013, Bensinger reported that Plaintiff's mood was "great" and her affect was "very bright," and noted Plaintiff's happiness as she discussed her consistent gym workouts, renting an art studio, and her decision to leave her job and move in with her mother to reduce financial burdens. [AR 371; *see also* AR 365] But by the end of December, Plaintiff presented to the emergency department ("ED") again, experiencing depression and SI. [AR 355]

Plaintiff reported that she had been feeling well until recently, but that after living with her mother for a few months and fighting more, she had increasingly frequent suicidal thoughts, and had considered driving off the road as a suicide attempt. [*Id.*;

*see also* AR 344, 353-54, 888, 900]  Plaintiff also pointed to recently quitting her job as a contributing factor to her mood.  [AR 888]  Plaintiff was admitted to Cedar Springs Hospital [AR 353], where she was "very proactive" in group therapy and worked on developing "better coping skills" [AR 929].  She also set up a family therapy session with her mother, recognizing the importance of addressing their relationship.  [*Id.*]  The family sessions were "very appropriate" and helped Plaintiff and her mother to "work[] through some of their instabilities."  [AR 889]  Plaintiff was discharged after five days.  [*Id.*]

Between the end of December 2013 and April 2014, Plaintiff's mental health appeared to be relatively stable.  [AR 323-24, 332-33]  In January 2014, Plaintiff reported that she was doing pretty well, had applied to be an online tutor for essay writing, and had started art school.  [AR 332]  But beginning in April 2014, Plaintiff presented to the ED four times in less than two months for increasing depression, citing to feeling overwhelmed by her new job at an art supply store and art classes [AR 820], delusions about purported embarrassing emails being sent about her[7] [AR 798-99, 806-07], and arguments with her mother [AR 790-91].  On each of those occasions, Plaintiff was ultimately discharged and declined inpatient services after discussions with providers and her mother.  [AR 790-91, 803, 809, 820]  In May 2014, Kimberly Narey, a rehabilitation counselor with the VA, wrote a letter reporting that Plaintiff had been rated as 60% disabled by the VA and that employment through the VA's Vocational Rehabilitation & Employment Division "[wa]s not feasible at this time."  [AR 609]

---

[7] Plaintiff would later elaborate on this conspiracy theory, alleging that gang members came into the store where she worked and shouted things about her based on emails from her previous employment.  [AR 784]  Plaintiff stated that her former employer sent these individuals, and expressed her belief that a car accident a few months later was the result of a related "hit" on her.  [*Id.*]

Plaintiff again appeared to stabilize between June and September 2014. She presented to appointments with Bensinger with bright affect and in good moods, and reported improvements in her relationship with her mother. [AR 770, 788-89] She quit her job at the art shop and began to work shorter hours at a local winery [AR 770, 789], she participated actively and positively in group therapy [AR 771], she volunteered, including as a Junior League member, and reported "living a well-balanced life" with respect to art, friends, family, diet, and exercising [AR 770].

In September 2014, Plaintiff was admitted to Cedar Springs for the second time, after presenting to the ED with a plan to overdose on pills, and again referencing harassing emails. [AR 735, 854] Plaintiff reported that she had gone on a date and had several drinks [AR 735-36], and providers noted that a recent stressor could have been Plaintiff's outpatient psychiatrist leaving the Denver VA Mental Health Clinic [AR 737]. Plaintiff denied SI throughout the admission, participated in group therapy and a family meeting with her mother, and demonstrated good mood, logical and coherent thoughts, no paranoid ideation, and improved sleep, energy, and appetite. [AR 845, 847] She was discharged after three days. [AR 845]

After Plaintiff's discharge, she continued to see Bensinger for individual therapy. Bensinger recounted Plaintiff's "complex delusional system," in which Plaintiff "chronically fixates/perseverates about her belief that her officers in the military were sending out 'embarrassing emails' to her friends, family, and random strangers," and Plaintiff's paranoia associated with this conspiracy. [AR 710] Bensinger explained that this "chronic delusional process consistently worsens during periods of stress and

depression," and noted the impact on Plaintiff over the past 18 months, including Plaintiff quitting her jobs, moving in with her mother, and applying for disability.  [*Id.*]

The remaining medical record before the Court reveals that Plaintiff has been relatively stable in her mental health from at least the end of September 2014 through February 2015, without any additional hospitalizations or inpatient stays.  Plaintiff has continued to be successful in group therapy, including participating actively with thoughtful contributions during sessions, and attending the group's holiday party in December 2014.  [AR 662-65, 679-80, 682-87, 690-91, 696, 726-27]  Plaintiff also has been dating.  [AR 664, 696, 707-08]  When Plaintiff ended one of these relationships, her provider noted that she "appear[e]d to be coping well" with the sadness associated with ending the relationship.  [AR 678-79]  Plaintiff's relationship with her mother also seems to be improved, with Plaintiff reporting going bowling weekly with her mother, and going on a cruise together.  [AR 671, 681]

### B.    Procedural History

Plaintiff's applications for DIB and SSI were initially denied on March 17, 2014. [AR 85]  On April 3, 2014, Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ").  [AR 89]  A hearing was conducted before ALJ Mark Dawson on April 13, 2015, at which Plaintiff and vocational expert ("VE") William Tisdale both testified.  [AR 36-66]  Plaintiff was represented at the hearing by attorney Brandon Selinsky.  [*See* AR 36]

On May 7, 2015 the ALJ issued a decision denying Plaintiff benefits.  [AR 15-31] Plaintiff timely requested a review of that decision by the Appeals Council [AR 10-11], which denied her request for review on October 20, 2016 [AR 1-3].  Plaintiff timely filed

an appeal with this Court on November 21, 2016.  [#1]  Because the Appeals Council denied Plaintiff's appeal, the ALJ's decision is the final decision of the Commissioner for purposes of this appeal.  *See* 20 C.F.R. §§ 404.981, 416.1481, 422.210.

### C.    The ALJ's Decision

The ALJ denied Plaintiff's applications for DIB and SSI after evaluating the evidence pursuant to the five-step sequential evaluation process.  [AR 15-31]  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since May 5, 2013, the alleged onset date.  [AR 17-18]  At step two, the ALJ found that Plaintiff had the following severe impairments: major depressive disorder, morbid obesity, borderline personality disorder, and anxiety disorder.  [AR 18]  At step three, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically exceeds the severity of one of the listed impairments in the appendix of the regulations.  [AR 19-21]

Following step three, the ALJ determined that Plaintiff retained the RFC to perform "light work" as defined in 20 C.F.R. § 404.1567(b), but with certain mental limitations.  [AR 21 (emphasis omitted)]  First, the ALJ found that Plaintiff was limited to occasional work interactions with supervisors, coworkers, and the public.  [*Id.*]  Second, the ALJ concluded that with respect to concentration, persistence, and pace, Plaintiff was limited to work not exceeding a Specific Vocational Preparation ("SVP") skill rating of two.  [*Id.*]  The ALJ provided a narrative setting forth the relevant evidence considered in determining the RFC and explaining the weight given to each of the medical opinions in the record.  [AR 21-29]

At step four, the ALJ found that Plaintiff was unable to perform any of her past relevant work, including her work as an HR specialist, economic analyst, and housing account representative. [AR 29] Finally, at step five, the ALJ concluded that, considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. [AR 30] Specifically, the ALJ agreed with the VE's testimony opining that Plaintiff could perform the following representative occupations: inserting machine operator, routing clerk, and address clerk. [AR 30-31] Accordingly, the ALJ determined that Plaintiff was not under a disability from May 5, 2013 through May 7, 2015 (the date of the ALJ's decision). [AR 31]

## III.   ANALYSIS

Plaintiff raises three challenges to the ALJ's decision on appeal. First, Plaintiff contends that the ALJ erroneously determined that Plaintiff's mental impairment did not meet the requirements of a listed impairment in the appendix of the regulations, and, relatedly, that the ALJ failed to elicit the testimony of a medical expert regarding whether Plaintiff had an impairment that met a listing. [#17 at 25-29] Second, Plaintiff maintains that the ALJ's findings regarding the weight to be afforded to the medical opinions were not based on substantial evidence. [*Id.* at 29-31] Third, Plaintiff argues that the ALJ's determination of Plaintiff's credibility at step four was not supported by substantial evidence. [*Id.* 31-33]

The Court finds that the ALJ did not provide sufficient reasoning at step three with respect to whether Plaintiff's mental impairment met a listing requirement. Because this error is "sufficient on its own to warrant reversal," the Court need not

address the remaining issues raised by Plaintiff. *O'dell v. Colvin*, No. 15-cv-00628-CBS, 2016 WL 5395247, at *2 (D. Colo. Sept. 27, 2016); *see also Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) ("We will not reach the remaining issues raised by appellant because they may be affected by the ALJ's treatment of this case on remand.").

As noted above, at step three the Commissioner must determine whether any of the plaintiff's severe impairments meets or medically exceeds the severity of one of the listed impairments in the appendix of the regulations ("the Listings"). *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Grogan*, 399 F.3d at 1261; *Bailey*, 250 F. Supp. 3d at 784. To meet a listing, the claimant's impairment must "satisf[y] all of the criteria of that listing, including any relevant criteria in the introduction, and meet[] the duration requirement." 20 C.F.R. § 416.925(c)(3). The claimant bears the burden of demonstrating that her impairment meets or equals the requirements of a listed impairment, *Fischer-Ross v. Barnhart*, 431 F.3d 729, 732 (10th Cir. 2005), but it is nevertheless "the responsibility of the ALJ to articulate the specific reasons for finding that the listing has not been met, including a discussion of 'the uncontroverted evidence that supports the claimant's application for benefits, and the significantly probative evidence that he or she rejects,'" *Howarth v. Berryhill*, No. 3:16-CV-1844 (JCH), 2017 WL 6527432, at *8 (D. Conn. Dec. 21, 2017) (citation omitted)). *See also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).

Plaintiff specifically argues that the ALJ erred by finding that she did not meet or equal any impairment in Listing 12.04 for affective disorders. [#17 at 25-29] Pursuant

to Listing 12.04, *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 (2015),[8] a claimant's affective disorder meets the criteria of a listed impairment if the requirements of both paragraph A and paragraph B are satisfied, or those of paragraph C alone are satisfied. Plaintiff contends that she meets the criteria of all three paragraphs, but focuses her argument on alleging that she meets the criteria of Paragraph C(2). [#17 at 25-28] Paragraph C requires that the claimant demonstrate the following:

> C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> > 1. Repeated episodes of decompensation, each of extended duration; or
> >
> > 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
> >
> > 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C). The parties do not appear to dispute that Plaintiff meets the threshold requirement of a "[m]edically documented history of a chronic affective disorder," lasting at least two years, and causing more than minimal limitation on her ability to complete basic work activities, "with symptoms or signs currently attenuated by medication or psychosocial support." *Id.* § 12.04(C)(2); [#17 at 26; #18 at 9-13; AR 18 (ALJ finding Plaintiff's impairments, including major depressive

---

[8] The listing criteria has since been superseded, *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 (2017), but the version of Listing 12.04 discussed herein was the version in effect at the time of the ALJ's decision.

disorder, borderline personality disorder, and anxiety disorder to be "severe because they more than minimally affect the claimant's ability to perform basic work activities")] Instead, the parties disagree about whether Plaintiff would be expected to decompensate following a minimal increase in mental demands or a change in her environment, as required by Paragraph C(2). [#17 at 26; #18 at 10-12]

If the claimant does not meet or equal a listing, the ALJ must "discuss the evidence and explain why he found that [claimant] was not disabled at step three." *Clifton*, 79 F.3d at 1009. But even if the ALJ fails to do so, "inadequate analysis at step three may constitute harmless error if the 'ALJ's findings at other steps of the sequential process [] provide a proper basis for upholding a step three conclusion that a claimant's impairments do not meet or equal any listed impairment.'" *Hawkins v. Colvin*, No. 2:13-cv-00980-EJF, 2015 WL 1481150, at *8 (D. Utah Mar. 31, 2015) (quoting *Fischer-Ross*, 431 F.3d at 733). An ALJ's error is harmless when the court finds that in light of the evidence that the ALJ considered, "no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." *Fischer-Ross*, 431 F.3d at 733-34 (quoting *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004)).

In *Jones v. Astrue*, No. 3:10-cv-01125, 2012 WL 3598814 (M.D. Tenn. July 31, 2012), *report and recommendation adopted*, 2012 WL 3596200 (M.D. Tenn. Aug. 20, 2012), the ALJ found that plaintiff did not meet the Listing 12.04 Paragraph C criteria. *Id.* at *15. The court determined that the ALJ's finding was supported by substantial evidence because the ALJ "discussed considerable changes in Plaintiff's life that did not cause her to decompensate," including caring for her children and grandchildren, and

also discussed evidence demonstrating that plaintiff's mental health had improved in the two years preceding the hearing before the ALJ, and "subsequent to" plaintiff's "hospitalizations and suicide attempts." *Id.* "The ALJ also specifically noted Plaintiff's improvement when she took her medication" and "ultimately determined" that the record "did not indicate that Plaintiff suffered from more than moderate limitations in functioning." *Id.*

By contrast, in *Lawrence v. Colvin*, No. 14-cv-00812-KMT, 2015 WL 5579432 (D. Colo. Sept. 23, 2015), this Court held that the ALJ did not offer adequate support for the conclusion that the plaintiff had not met the 12.04 Paragraph C criteria. *Id.* at *4. There, "[t]he record contain[ed] evidence of the claimant decompensating after even minimal increases in mental demands or changes in the environment," as required by Paragraph C(2), including evidence that plaintiff suffered panic attacks both when she received a new supervisor and when she had to take a drug test at a new job, and that she withdrew from mental health treatment when her therapist changed. *Id.* Although the ALJ found that "the claimant's testimony about the intensity, persistence, and limiting effects of her symptoms" was not credible, "the ALJ never indicated doubt that these episodes of decompensation occurred, which is all that the second criterion of Paragraph C appears to require." *Id.* (citation omitted). The Court concluded that "[g]iven the absence of a sufficient explanation for the ALJ's Paragraph C conclusion and the existence of uncontradicted and undisputed evidence" that the claimant met Paragraph C(2), the ALJ had "not articulated a sufficient basis to determine whether" the Paragraph C conclusion was supported by substantial evidence—a reversible error. *Id.* at *5 (citing *Byron v. Heckler*, 742 F.3d 1232, 1235 (10th Cir. 1984)).

Similarly, in *Gonzalez v. Commissioner of Social Security*, No. 16 Civ. 8445 (KMK) (PED), 2017 WL 7310391 (S.D.N.Y. Dec. 21, 2017), *report and recommendation adopted*, 2018 WL 671261 (S.D.N.Y. Jan. 31, 2018), the court found the ALJ's conclusory statement, that "[t]here [wa]s no medical evidence or testimony" that plaintiff satisfied Paragraph C, to be inadequate. *Id.* at *10 (citation omitted). The court explained that the ALJ had ignored evidence of the plaintiff suffering repeated episodes of decompensation, "including withdrawal [fr]om situations, poor decision making, inability to appropriately accept supervision, . . . deterioration from previous levels of functioning, . . . and inability to adapt to changing demands of context." *Id.* "While this evidence d[id] not conclusively demonstrate" that plaintiff met Paragraph C, it was "unclear [fr]om the face of the decision whether the ALJ even considered" that evidence, and thus the court held that the ALJ had not "offered a meaningful analysis of the Paragraph C criteria." *Id.* at *11.

The court in *Howarth v. Berryhill* similarly concluded that the ALJ did not adequately articulate, and the opinion did not clearly support, the ALJ's finding that the plaintiff did not meet Paragraph C of 12.04. 2017 WL 6527432, at *8. In that case, the ALJ did not discuss the Paragraph C(2) criteria at all, but made findings "in other parts of the decision" that plaintiff's impairments were "only mild to moderate and that he [wa]s able to live on his own and take care of his personal needs." *Id.* at *7. However, there was "also evidence in the record that [the plaintiff] had a history of hospitalizations," including three over the past several years. *Id.*

Here, in determining that "the evidence fail[ed] to establish the presence of the 'paragraph C' criteria," the ALJ offered the following explanation with respect to Paragraph C(2):

> Though her symptoms have fluctuated, there is no evidence the claimant would be expected to decompensate following a minimal increase in mental demands or a change in her environment as opined by Dr. Maximillian Wachtel (PhD). The record outlines she has struggled with living with her mother but managed this by participating in activities outside of the home.[9]

[AR 21] Although the ALJ here provided a slightly more detailed rationale for his Paragraph C(2) conclusion than the ALJs in *Lawrence*, *Gonzalez*, and *Howarth*, the Court nevertheless finds his explanation insufficient for determining whether that conclusion is based on substantial evidence. *See Lawrence*, 2015 WL 5579432, at *5.

First, the ALJ found that Plaintiff's impairments, including major depressive disorder, borderline personality disorder, and anxiety disorder, were severe. [AR 18] The ALJ then acknowledged that Plaintiff's symptoms have fluctuated, but nevertheless concluded that there was "no evidence" that Plaintiff would be expected to decompensate following a minimal increase in mental demands or a change in her environment "as opined by Dr. [Wachtel]."[10] [AR 21] But, according to the record,

---

[9] With respect to the other Paragraph C criteria, the ALJ "found no objective medical evidence of recurring episodes of decompensation over an ex[t]ended [duration] during any two-year period," and that Plaintiff "d[id] not require a supportive living arrangement." [AR 21] As discussed above, a claimant can satisfy Paragraph C by demonstrating that she meets one of three subparagraphs. Because Plaintiff focuses her argument on alleging that she has satisfied the requirements of Paragraph C(2) [#17 at 26], the Court does not address the ALJ's rationale with respect to the other subparagraphs of Listing 12.04(C).

[10] The ALJ seemed to suggest that Dr. Wachtel, a licensed psychologist hired by Plaintiff to evaluate her, gave the only opinion that Plaintiff has a residual disease process such that "even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate," as required

Plaintiff presented to the ER at least nine times between May 2013 and September 2014, and of those times was hospitalized for inpatient care on at least four occasions.[11] [AR 281-82, 355, 419, 421-23, 473-74, 536-37, 734, 790-91, 798-99, 806-07, 820]  The ALJ apparently blamed Plaintiff's symptom fluctuation on her difficult relationship with her mother, and noted that Plaintiff had been able to manage the relationship by participating in activities outside of the home.  [AR 21; *see also* AR 25 (finding that stress "flare ups" appear "more so related to difficulties associated with interpersonal relationships between [Plaintiff] and her immediate family")]  Even assuming that Plaintiff's conflicts with her mother would not constitute "a minimal increase in mental demands" or a "change in [her] environment,"[12] the record demonstrates that many of

---

by Paragraph C(2).  [AR 832; *see also* AR 21]  While no other medical opinions discussed Plaintiff's limitations using the precise listing criteria terminology, Plaintiff's treating psychotherapist, Rachel Bensinger, made note of Plaintiff's "persistent pattern of frequent decompensation requiring multiple crisis interventions (ED visits, [inpatient] hospitalizations)" [AR 789], and reported that while Plaintiff had periods of high functioning, her conditions caused unpredictable flare ups "rend[ering] her impaired in multiple life activities" [AR 394-95].  Similarly, Bensinger referenced Plaintiff's "chronic delusional process" with respect to her paranoia about emails, which "consistently worsens during periods of stress and depression" and has contributed to Plaintiff quitting both her full and part-time jobs, applying for disability, and moving in with her mother.  [AR 710]  The ALJ discussed these opinions to some extent in other portions of his written opinion.  [*See* AR 25-28]

[11] The ALJ referenced these hospitalizations elsewhere in his opinion, including with respect to Paragraph C(1), in finding that none of the episodes constituted "episodes of decompensation, each of extended duration," because Plaintiff's hospital stays did not last for more than a week.  [AR 20-21]  However, Paragraph C(2) does not include a durational requirement.

[12] The ALJ did not explain why Plaintiff's relationship with her mother, which often contributed to her hospitalizations, was evidence that she did not satisfy the Paragraph C(2) criteria.  The Commissioner argues that Plaintiff and her mother's arguments were ongoing and thus "not a change in environment or increase in mental demands."  [#18 at 11]  But the record seems to undermine that conclusion, at least in part.  For example, when Plaintiff presented to the ED in December 2013, she reported that after moving in with her mother and fighting with her, she had increasingly frequent suicidal thoughts.  [AR 344-45]  Plaintiff's move to her mother's home would appear to constitute

Plaintiff's hospitalizations were triggered not just by her rocky relationship with her mother, but also by financial stressors, conflicts at work, and attempts to participate in new jobs or activities—precisely the type of events that appear to be contemplated by Paragraph C(2).

For example, in July 2013, Plaintiff cited to her conspiracy theory with respect to emails being sent about her at work, and financial stress, in addition to difficulties in her relationship with her mother and coworkers, as triggers for her hospitalization. [AR 281-82, 467, 473-74, 490]  In December 2013, when Plaintiff returned to the ED, she reported feeling very depressed for the past few days, which as providers noted, coincided with her therapist discussing ending Plaintiff's individual therapy. [AR 355] Plaintiff also reported arguments with her mother, and ruminating about conflicts at work. [*Id.*]  Plaintiff presented to the ED four times between April and May 2014, within a few months of beginning work as an online tutor and at an art supply shop, and starting art school. [AR 790-91, 798-99, 806-07, 820]  Plaintiff attributed the hospitalizations to feeling overwhelmed by her new job and art classes, in addition to referencing delusions about work emails and ongoing arguments with her mother. [*Id.*] In September 2014, Plaintiff again presented to the hospital with SI. [AR 734]  At that time, she had gone on a date and had several drinks [AR 735-36], her outpatient psychiatrist had left the Denver VA Mental Health Clinic [AR 737], and she had recently begun a new job at a wine shop [*see* AR 770].  Plaintiff also continued to cite her paranoia about harassing emails. [AR 735]  This Court concluded in *Lawrence* that the

---

a "change in the environment," and her subsequent hospitalization a period of decompensation, under Paragraph C(2).

mere fact that episodes of decompensation had occurred, alone, was sufficient to satisfy Paragraph C(2). *Lawrence*, 2015 WL 5579432, at *4.

During the hearing, the ALJ explicitly recognized Plaintiff's tendency to decompensate every few months. He noted that Plaintiff "seem[ed] to have this pattern of being able to do some things for a[]while and then winding up in the hospital," which Plaintiff confirmed. [AR 53] The ALJ also asked if Plaintiff felt like she could "do some things for a few hours or for 20 hours a week," but then this activity would catch up with her, and Plaintiff responded affirmatively. [*Id.*] The ALJ here, like the ALJ in *Lawrence*, questioned Plaintiff's credibility with respect to her statements about the intensity, persistence, and limiting effects of her symptoms, but he never disputed that the episodes of decompensation occurred. [AR 23-24] In his written opinion, the ALJ also acknowledged Plaintiff's "evidence of clear improvement," but then "events exacerbating the symptoms just prior to the hospitalizations." [AR 21] These findings seem to directly correlate with the Paragraph C(2) criteria and to contradict the ALJ's conclusion that there was "no evidence" that Plaintiff would be expected to decompensate following a minimal increase in mental demands or a change in her environment. [*Id.*]

Like the ALJ in *Howarth*, the ALJ here referenced occasions when Plaintiff has not decompensated, and has been relatively stable in her mental health, including finding that Plaintiff goes out almost every day, is able to shop, has been actively involved in group therapy, and continues to drive. [AR 19-20] The ALJ also found that Plaintiff had attempted to attend art school and stopped going primarily for financial reasons, rather than mental health symptoms, and noted that Plaintiff was active outside of the home and had gone on dates. [AR 23-24] The Commissioner similarly

argues that "there were several instances where, rather than decompensating, Plaintiff noted that she was using coping skills, therapy, exercise, and outside activities to manage her symptoms," and that after her most recent hospitalization in September 2014, Plaintiff had handled conflicts from online dating and difficulties working a part-time job without decompensating.[13]  [#18 at 11-12]

But the ALJ does not explain, at step three or elsewhere in the opinion, how he resolved these discrepancies, except to note that Plaintiff's hospitalizations appeared to be related primarily to her stressful relationship with her mother.  [*See, e.g.*, AR 22-25] As discussed above, even assuming that relationship stressors could not constitute mental demands or environmental changes under Paragraph C(2), attributing Plaintiff's hospitalizations to her relationship with her mother does not tell the whole story.  The ALJ's very brief discussion of the Paragraph C(2) criteria does not provide an adequate explanation for the ALJ's finding that Plaintiff did not satisfy Paragraph C(2), and the Court cannot provide that explanation here.  *See Howarth*, 2017 WL 6527432, at *7-8; *see also O'dell*, 2016 WL 5395247, at *5 ("[T]his court will not undertake a post hoc effort to justify the ALJ's conclusions.  To do so would 'overstep our institutional role and usurp essential functions committed in the first instance to the administrative process.'" (quoting *Robinson v. Barnhart*, 366 F.3d 1078, 1084-85 (10th Cir. 2004))).  Accordingly, the Court is unable to determine whether the ALJ's Paragraph C(2) conclusion is supported by substantial evidence, which is reversible error.  *See Lawrence*, 2015 WL

---

[13]  The representation that Plaintiff was able to handle these changes without decompensating may not be entirely accurate.  Plaintiff began her part-time job at the wine shop in July 2014 [AR 18, 1229], was hospitalized two months later in September 2014 [AR 734], and apparently quit that job following the hospitalization [AR 52-53, 697].

5579432, at *4-5.  The ALJ's error at this step of the analysis was not harmless because a reasonable factfinder could have determined that Plaintiff met the listing criteria, especially in light of the undisputed evidence of her numerous hospitalizations.  *See Fischer-Ross*, 431 F.3d at 733-34.

The Court need not address the other arguments raised by Plaintiff because the ALJ's errors in analyzing the listing criteria at step three alone warrant reversal and remand.[14]  *See Watkins*, 350 F.3d at 1299; *O'dell*, 2016 WL 5395247, at *2.  The Court makes no determination with respect to whether Plaintiff was disabled during the relevant period or whether she should be awarded benefits.  The Court leaves those issues to be determined by the Commissioner after further proceedings.

## IV.  CONCLUSION

Accordingly, for the foregoing reasons, the Court **REVERSES** the Commissioner's decision that Plaintiff was not under a disability within the meaning of the SSA from May 5, 2013 through May 7, 2015 and **REMANDS** this matter to the Commissioner for rehearing and reconsideration consistent with this Order.

---

[14] Citing to § I-2-5-34 of the Hearings, Appeals, and Litigation Law Manual ("HALLEX"), Plaintiff also argues that the ALJ erred at step three by failing to obtain a medical expert opinion, because the ALJ was considering a finding that Plaintiff's impairments met or medically equaled a listing.  [#17 at 28-29]   The Commissioner responds that the ALJ "merely determined" whether Plaintiff's impairments met or medically equaled a listed impairment, and that the ALJ did not go "one step further" to "actually consider[] a finding that Plaintiff's impairments met or medically equaled a medical listing."  [#18 at 13 (quoting *Welch v. Colvin*, No. 15-cv-00517-CMA, 2016 WL 106871, at *6 (D. Colo. Jan. 11, 2016))]   First, neither party addresses the difference between "*considering a finding*" that an impairment meets a listing and "*determining*" that an impairment meets a listing, or applies this standard with any clarity to the facts of Plaintiff's case.  Second, the Tenth Circuit has not determined whether HALLEX carries the force of law.  *Lee v. Colvin*, 631 F. App'x 538, 543 (10th Cir. 2015).   Finally, the Court finds remand necessary irrespective of this issue, for the reasons discussed above.  Thus, the Court need not reach this alternative argument.

DATED:  February 27, 2018                                         BY THE COURT:

                                                             s/Scott T. Varholak
                                                             United States Magistrate Judge